[No. 57562-7-I.   Division One.   June 25, 2007.]

WILLIAM C. UZNAY, *Respondent*, v. PETER BEVIS ET AL.,
*Appellants*.

*Jose F. Vera* (of *Vera & Associates, PLLC*) and *Shelley M. Hall* and *Phillip H. Ginsberg* (of *Stokes Lawrence Velikanje Moore & Shore*), for appellants.

*John E. Glowney*, for respondent.

¶1 GROSSE, J. — In the absence of an express agreement, for waiver of a time limit in a real estate sales agreement to apply, the seller must "unequivocally evince an intention to waive the time limit" in the contract, "or by his conduct lead purchasers to their default to support waiver or estoppel."[1] Because we find one of the sellers did not unequivocally waive the time limit and because the record does not support a finding that the purchaser detrimentally relied on any representation or conduct of the seller, we reverse.

## FACTS

¶2 William Uznay has been a member of the Fremont community of Seattle since 1980 and for many years operated his business there and acquired several commercial buildings in Fremont. Peter Bevis has also been a resident of Fremont since the early 1980s. He purchased the property at issue in this case in the early 1980s. On this property he built an artist's studio known as the Foundry in

---

[1] *Artz v. O'Bannon*, 17 Wn. App. 421, 425, 562 P.2d 674 (1977) (citing *Nadeau v. Beers*, 73 Wn.2d 608, 440 P.2d 164 (1968)).

Fremont. Mary Pat Sawyer is Bevis' mother and lives in California. She has substantial business and real estate experience. Sawyer jointly funded Bevis' Foundry project.

¶3 In 1986, Bevis incorporated Heitman Land Company (Heitman) as a Washington corporation. Bevis was the registered agent for Heitman and its president. Sawyer was the secretary. Bevis was a 40 percent shareholder and Sawyer a 60 percent shareholder. There were no other officers or shareholders. Bevis also incorporated The Fremont Fine Arts Foundry, Inc., which owned, operated, and managed artisanal activities on the property.

¶4 Bevis executed a quitclaim deed for the property at issue to Heitman in April 1990. In May 1990, Heitman took out a loan with First Interstate Bank. Heitman leased the property to The Fremont Fine Arts Foundry, Inc.

¶5 Unknown to Bevis and Sawyer, Heitman had been administratively dissolved by the state of Washington on February 16, 1988. The corporation was never reinstated during the two-year period available for reinstatement. Heitman dissolved prior to Bevis's quitclaiming the property to Heitman and prior to the loan by First Interstate Bank, which still holds the deed of trust.

¶6 During all times relevant (1986-2003), Bevis managed the daily affairs of Heitman. Sawyer did not live in Seattle. Bevis and Sawyer continued to conduct Heitman's business in accordance with corporate articles and bylaws. Both before and after Bevis executed the quitclaim deed to Heitman, Heitman held meetings of the two shareholders. Heitman has filed tax returns as a subchapter S corporation with K-1 returns for Bevis and Sawyer as shareholders every year from 1987 through 2003. Thus, all profits and losses were allocated to these two individuals and not to the corporation. Bevis and Sawyer held regular meetings, kept minutes, consulted with each other, and made joint decisions on all major issues. Bevis testified at trial that he relied upon Sawyer for major decisions because of her business experience. Sawyer also provided Heitman with a significant

amount of funding. However, Sawyer had almost no involvement with the day to day affairs of Heitman.

¶7 Bevis and Uznay have been acquaintances since the early 1980s. Bevis put the property at issue up for sale in 2003. When Uznay learned the property was for sale, he approached Bevis in April 2003 to make an offer. Uznay and Bevis discussed a purchase price of $2 million, which was Bevis' asking price. Uznay's proposed offer included a $300,000 down payment, a financing contingency for a loan for the amount of $1,400,000, and required Bevis to accept a $300,000 note from Uznay secured by a second deed of trust on the property. Bevis consulted with Sawyer and they agreed to sell the property to Uznay.

¶8 Eric Olsen, Uznay's real estate agent, drafted a purchase and sale agreement (PSA) that served as the written offer. He originally prepared the PSA for the signature of Peter Bevis as president of Heitman Land Company. Olsen later was told by Uznay, Bevis, or Bevis' real estate agent (he did not recall at trial who told him) that the PSA should have signature lines for Bevis and for Sawyer under the name Heitman Land Company as the seller. He thus prepared the PSA with Heitman identified as the seller, with signature lines for both Bevis and Sawyer. Olsen also ordered a title report. The report listed Heitman as the owner of the property.

¶9 The PSA states in pertinent part:

> The undersigned Seller on this ____ day of May 2003, hereby accepts and approves the above Agreement and agrees to carry out all of the terms thereof. . . . I/we further acknowledge receipt a true copy of this Agreement, signed by both parties.
>
> SELLER: Heitman Land Company
>
> _____       _____
> Peter W. Bevis              Mary Pat Sawyer

The PSA also states, "Failure of Purchaser to secure a Letter of Commitment for financing within said forth-five [sic] (45) day period shall render this agreement void." It also states, "There are no verbal or other agreements,

which modify or affect this Agreement. Time is of the essence in this Agreement."

¶10 Bevis and Uznay signed the PSA in person and initialed every page and Sawyer signed the PSA and initialed every page via fax. Afterward, Olsen circulated a second PSA for signature and sent it by courier to Sawyer in order to obtain original signatures and original initials for every page from all three signatories. The date of mutual acceptance was May 14, 2003. The 45-day deadline for Uznay to obtain financing was June 28.

¶11 Uznay deposited $30,000 earnest money in the form of a promissory note after the PSA was signed. He then promptly applied for financing with NorthStar Bank and arranged to borrow $300,000 from his mother, his aunt, and a friend to be used for the cash down payment.

¶12 In or about the week of June 20, 2003, Uznay became concerned that the bank would not be able to provide the commitment letter within the original time period. Uznay requested an extension of time from Bevis. Bevis was concerned about the delay and also requested additional consideration for the extension.

¶13 Bevis was concerned by the delay because he wished to have funds available from the sale of the property to bid at a bankruptcy court auction for the sale of the *Kalakala*, a ferry in Alaska he wished to return to Seattle. Bevis had spent much time and effort with the Kalakala Foundation.

¶14 Bevis contacted Stan Miner, a commercial loan officer at NorthStar Bank, who reassured Bevis that the delay in loan processing was due to delays in receiving the appraisal and environmental report on the property, which were expected to be completed very soon, and that the bank could close the sale relatively promptly. Bevis also learned that the sale of the *Kalakala* had been postponed to July 27 or 28.

¶15 After further discussions with Uznay, Bevis dropped his demand for additional consideration for the extension of time. Olsen drafted the PSA addendum (Addendum). The

Addendum is a one sentence agreement extending the time for financing to July 21, 2003. It provided that all other terms remained unchanged. The Addendum contains three signature lines, consistent with the PSA: one for the buyer, Uznay; and two for the seller, Heitman, Bevis, and Sawyer. It contains no date or days certain for the agreement to be signed.

¶16 On the morning of June 27, Olsen took the Addendum to Uznay, who signed the document. Olsen then went to Bevis' office, located in the Foundry, one block away. Bevis told Olsen he needed to speak to his mother about the Addendum before signing it. Sawyer had already spoken to Bevis about extending the financing contingency before Olsen showed Bevis the document itself. After speaking to Sawyer, Bevis signed the Addendum.

¶17 Olsen then spoke to Sawyer on the phone. Sawyer testified that she told Olsen that she would go along with what Bevis was doing. She and Olsen then discussed arrangements for her to sign the Addendum by fax or in person. Olsen first proposed that he fax the Addendum to Sawyer for her signature within the next hour, as he had done with the PSA, but Sawyer said she could not pick up a fax that day because of her schedule. He then proposed that he fax it to her the next day, but Sawyer told him that the office where she picked up her faxes would be closed. However, Sawyer said she was going to be flying to SeaTac on her way to Lake Chelan to meet Bevis and other family members for a Fourth of July family gathering. Olsen and Sawyer agreed that Olsen would meet Sawyer at the airport right when she arrived to obtain her signature before she left for Lake Chelan.

¶18 The meeting at the airport never occurred due to delays in Sawyer's flight. Olsen was scheduled to leave for Montana for the holiday weekend and was unable to arrange another meeting with Sawyer. Olsen left for vacation after leaving the Addendum with Uznay to deliver to Bevis to obtain Sawyer's signature. Uznay left the Addendum in Bevis' mail slot at the property on June 30. Bevis

did not discover the Addendum there until after he returned from Lake Chelan. He then mailed the Addendum to Sawyer, who had returned to California after the holiday, for her signature.

¶19 On July 1, the day Bevis returned from Lake Chelan, Bevis met with the environmental inspector for Uznay's loan. The appraisal was completed on or about July 1 and the environmental report was completed on or about July 3. Uznay paid $1,000 for the environmental report.

¶20 In a telephone conversation between Bevis and Olsen on July 8, Bevis told Olsen that he was mailing the Addendum to Sawyer for her signature. Olsen also told Bevis that he had heard from Miner that the loan would most probably be approved on July 11.

¶21 On July 10, Bevis received a new offer from another prospective buyer in the amount of $2.2 million cash. The same day, Bevis called Sawyer to inform her of the new offer and learned that she had never signed the Addendum. Bevis then met with his real estate agent, John Sullivan, who advised Bevis that as the Addendum had not been signed by Sawyer, Heitman could accept the new offer.

¶22 Bevis called Uznay the next day and told him that he had a higher offer and that they were out of contract because Sawyer had never signed the Addendum. He offered Uznay right of first refusal at the new price of $2.2 million. Uznay told Bevis he could not pay the new price because his financing was based upon the $2 million amount. Bevis then told Uznay that he and Sawyer were planning to accept the new offer.

¶23 The next day, on July 11, the NorthStar Bank loan committee approved the loan to Uznay. Uznay learned of it on that day and signed the loan commitment the same day. Uznay did not inform Miner that Heitman was refusing to go forward.

¶24 On July 12, Uznay sent Bevis a letter to inform him that he had removed the financing contingency and converted his $30,000 promissory note to cash and deposited it with escrow. This cash is still on deposit.

¶25 On July 15, Heitman's attorney sent a letter to Uznay and Olsen stating that Heitman considered the PSA with Uznay to have expired and that he proceeded at his own risk. On or about the same day, Heitman directed escrow to close the file for the sale. On July 18, Uznay filed this lawsuit and filed a lis pendens on the property.

¶26 At the commencement of proceedings below, Uznay moved to strike Heitman's jury demand and the trial court granted the motion. Heitman brought a summary judgment motion claiming that the extension was unenforceable for lack of consideration. The trial court denied the motion. Uznay brought a motion for partial summary judgment based upon Heitman's administrative dissolution in 1988. The trial court denied the motion.

¶27 After a three-day bench trial, the trial court ruled in favor of Uznay. Applying common law estoppel theory, the trial court ordered specific performance of the sale and awarded Uznay additional damages and attorney fees. Bevis, Sawyer, and Heitman appeal. Uznay cross-appeals.[2]

## ANALYSIS

¶28 Uznay requests that the trial court's decision be affirmed on grounds that Bevis, Sawyer, and Heitman either unequivocally waived the time limit on the contract, or that Bevis, Sawyer, and Heitman be barred from asserting the time limit on estoppel principles because their conduct led Uznay to believe they had agreed to extend the time limit. The rule in Washington is that for waiver to apply, the seller must "unequivocally evince an intention to waive the time limit" in the contract, "or by his conduct lead purchasers to their default to support waiver or estoppel."[3] The trial court found that Sawyer did not waive the requirement of her signature on the Addendum in order to

---

[2] Bevis, Sawyer, and Heitman's motion to strike portions of Uznay's reply brief is denied. The court did not consider any improper arguments contained therein.

[3] *Artz*, 17 Wn. App. at 425 (citing *Nadeau*, 73 Wn.2d 608).

extend the time period for Uznay to secure financing; however, it concluded that Uznay reasonably relied to his detriment on representations made by Bevis and thus gave the terms of the Addendum full force and effect based on estoppel.

¶29 Turning first to the issue of waiver, the PSA by its own terms required both Bevis' and Sawyer's signatures. It states:

> The undersigned Seller on this ____ day of May 2003, hereby accepts and approves the above Agreement and agrees to carry out all of the terms thereof. . . . I/we further acknowledge receipt a true copy of this Agreement, signed by both parties.
> SELLER: Heitman Land Company

> _____        _____
> Peter W. Bevis          Mary Pat Sawyer

As stated by the trial court, "The plain meaning of this term is that signature is necessary to evidence assent." The signature lines include the place for Sawyer's signature. The Addendum, which provided for an extension of time for performance under the contract, contained the same signature line for Sawyer and stated, "[a]ll other Terms and Conditions remain unchanged." Thus, absent Sawyer's signature or actions by Sawyer that unequivocally evince an intention to waive her signature, the PSA expired and the Addendum never took effect.

¶30 Sawyer never signed the Addendum and the trial court concluded that Sawyer did not unequivocally evince an intention to waive her signature. The trial court stated:

> All parties acted as if signatures were necessary for assent to the [PSA] Addendum. Mr. Olsen, the drafter of the [PSA] Addendum and agent for Mr. Uznay, again went to great efforts to ensure that he had signatures for [PSA] Addendum even after speaking with Ms. Sawyer. Even though she had not signed by June 27th, he continued to seek her signature until his July 4th vacation. After that, Mr. Uznay, who remained in town, also pursued a signature from Ms. Sawyer after Mr. Olsen went on vacation.

. . . .

On June 27th, Ms. Sawyer agreed to meet to sign the Addendum, but she did not agree to waive her signature. Her statement of "I'll go along with whatever Peter wants to do" does not constitute waiver of her signature when in the same conversation Ms. Sawyer and Mr. Olsen proceeded to arrange for her signature to be obtained.

For waiver to apply, "[i]t must be shown by unequivocal acts or conduct showing an intent to waive, and the conduct must also be inconsistent with any intention other than to waive."[4] We agree with the trial court that Sawyer's statement on the telephone did not unequivocally evince her intent to waive her signature as a requirement for her assent to the Addendum's terms when, during the very same conversation, she proceeded to make arrangements with Olsen to review and sign the Addendum. It follows that because she did not waive her signature as a requirement to evince her assent to the terms of the Addendum, it cannot be said that she waived the time limit contained in the PSA that was to be extended by the Addendum.[5]

■■ ¶31 Turning to the issue of estoppel, the parties dispute whether the trial court used promissory estoppel or equitable estoppel to breathe life into the Addendum. The trial court failed to explain what theory of estoppel it applied. Promissory estoppel requires the plaintiff to prove:

" '(1) [a] promise which (2) the promisor should reasonably expect to cause the promisee to change his position and (3) which does cause the promisee to change his position (4)

---

[4] *Mid-Town Ltd. P'ship v. Preston*, 69 Wn. App. 227, 233, 848 P.2d 1268 (1993).

[5] For the same reasons, there was no enforceable agreement to extend the deadline. By the contract's own terms and the conduct of the parties, Sawyer's signature was necessary for the execution of the Addendum extending time to secure financing. Sawyer did not waive her signature as a requirement to evince her assent to the terms of the Addendum.

justifiably relying upon the promise, in such a manner that (5) injustice can be avoided only by enforcement of the promise.' "[6]

Equitable estoppel requires:

> (1) an admission, statement, or act inconsistent with the claim afterwards asserted; (2) action by the other party on the faith of such admission, statement or act; (3) injury to such other party resulting from permitting the first party to contradict or repudiate such admission, statement, or act.[7]

Regardless of which theory of estoppel the trial court applied, for its decision to be upheld the record must support the conclusion that Bevis, Sawyer, and Heitman by their conduct led Uznay to his default on the contract. Or, in other words, the record must show detrimental reliance on the part of Uznay.

¶32 In finding for Uznay, the trial court concluded that Bevis' conduct in agreeing to take steps to obtain Sawyer's signature, combined with Sawyer's statement that she would go along with what Bevis wanted to do, lulled Uznay into failing to take further steps to contact Sawyer personally to secure her signature and into taking further steps to secure financing. The trial court explained:

> 13. . . . On July 1st and after the 4th of July, Mr. Bevis, at the request of Mr. Uznay and Olsen, agreed to obtain Ms. Sawyer's signature. Mr. Uznay and Mr. Olsen reasonably relied upon that representation and took no further steps to contact her personally [to] obtain her signature. That reasonable reliance was reinforced by Mr. Olsen's subsequent telephone calls to Mr. Bevis on or about July 8th and 9th. Mr. Bevis also continued to act as if he intended to perform and close the deal. Mr. Bevis admitted that he was acting to close the deal. The Court concludes that he would have closed the deal but for the higher offer and Mr. Bevis admitted as much. Essentially, Mr. Bevis agreed to obtain the signature, but when he realized there was

---

[6] *Havens v. C&D Plastics, Inc.*, 124 Wn.2d 158, 171-72, 876 P.2d 435 (1994) (quoting *Klinke v. Famous Recipe Fried Chicken, Inc.*, 94 Wn.2d 255, 259 n.2, 616 P.2d 644 (1980)).

[7] *Wilson v. Westinghouse Elec. Corp.*, 85 Wn.2d 78, 81, 530 P.2d 298 (1975).

a higher offer, and realized that the Addendum was not signed, he used that fact as a way of trying to take the higher offer.

14. In addition, Mr. Uznay reasonably relied upon Mr. Bevis' agreement in light of the knowledge that Ms. Sawyer had stated that she would go along with what her son wished and in light of the fact that she made arrangements to sign. Thus, Mr. Uznay could reasonably believe that obtaining Ms. Sawyer's signature was a formality and that she had assented.

15. At that time, it appeared that Mr. Bevis was acting on behalf of his Heitman partner in finalizing the deal.

16. Mr. Uznay detrimentally relied in that he took no further steps to obtain her signature and that he took affirmative steps to complete his financing.

17. Mr. Uznay has met the burden of proof and is entitled to specific performance of the purchase and sale agreement.

¶33 However, we find there is insufficient evidence of detrimental reliance on the part of Uznay to justify the trial court's use of estoppel to enforce the terms of the Addendum. First, the facts indicate that Uznay and Olsen never stopped trying get Sawyer's signature. After several failed attempts, they decided to have Bevis mail the documents to Sawyer in California to obtain her signature. Bevis fulfilled his promise to mail the documents to Sawyer; however, before Sawyer could sign the documents, a better offer came along. In addition, all of the steps Uznay took to complete his financing were undertaken the day after his financing came through, which was also the day after Bevis told him the deal was dead. Before then, all Uznay had to do was wait for the financing to go through. These steps cannot be used to show justifiable, detrimental reliance on the part of Uznay since they occurred after he had been informed the deal was dead.[8]

¶34 On cross-appeal, Uznay argues that only Bevis' signature was required on the Addendum because he was

---

[8] Uznay did write a $1,000 check for an environmental inspection on June 30, but the inspection had been ordered long before the extension discussions. Furthermore, there is also no evidence in the record that Uznay would have waived the financing contingency had he known that Sawyer was not going to sign the Addendum and agree to the time extension.

the only person who had legal title to the property, and he signed the Addendum. Uznay argues this was because Heitman never obtained legal title to the property when Bevis deeded it to Heitman in 1990 because Heitman had been administratively dissolved at the time the deed was delivered. Because a deed to a dissolved corporation fails, the argument goes, Bevis retained sole legal interest in the property, and because he signed both the PSA and the Addendum, Uznay is free to assert it against the real party in interest—Bevis.

¶35 The trial court addressed Uznay's argument by finding that while Heitman did not exist as a corporation at the time the deed was delivered, the facts established that it existed as a partnership—even if Bevis and Sawyer still thought it was a corporation. The trial court thus found that the property was conveyed to the partnership and that both Bevis' and Sawyer's signatures were required as partners to the sale of the property.

¶36 Uznay is correct when he states the general proposition that a deed is void if the named grantee is not a legal entity.[9] He is also correct in stating that "a contract made in the name of a dissolved corporation may sometimes be enforced by another person associated with the corporation who is a real party in interest" and "when a person assumes to act as a corporation, the person is personally liable to the other party on the contract."[10] However, whether or not Bevis was the sole owner of the property is beside the point. The point is that, regardless of the reason, the PSA and the Addendum by their own terms required both Bevis' and Sawyer's signatures to be valid and everyone involved acted as if this were so. Thus, because the Addendum failed to contain Sawyer's signature and waiver and estoppel do not apply, it is unenforceable by its own terms.

¶37 In sum, because we find the trial court erred in finding for Uznay, we reverse the trial court's award of

---

[9] *John Davis & Co. v. Cedar Glen # Four, Inc.*, 75 Wn.2d 214, 220, 450 P.2d 166 (1969).

[10] *White v. Dvorak*, 78 Wn. App. 105, 109-10, 896 P.2d 85 (1995).

specific performance, lost rents, and other damages to Uznay, and we need not reach the jury demand issue raised by Bevis, Sawyer, and Heitman. Furthermore, the PSA contains a prevailing party attorney fees provision and the trial court awarded Uznay fees below. We reverse the fee award and hold that Bevis, Sawyer, and Heitman are entitled to fees below and on appeal.

BAKER and DWYER, JJ., concur.

Reconsideration denied July 20, 2007.

Review denied at 163 Wn.2d 1028 (2008).